AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**06/25/2020**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CLO _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

6/25/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DL _____ DEPUTY

United States of America

v.

MICAH TILLMON,

    Defendant

Case No.    2:20-mj-02980

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 31, 2020, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(i) | Arson Affecting Interstate and Foreign Commerce |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Gabriel Denton_
*Complainant's signature*

Gabriel Denton, Special Agent, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    June 25, 2020

*Judge's signature*

City and state:    Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Gabriel Denton, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of:

    a.   a criminal complaint against and arrest warrant for Micah Tillmon ("TILLMON") for a violation of 18 U.S.C. § 844(i) (Arson Affecting Interstate or Foreign Commerce);

    b.   an application for a warrant to search the premises located at 23818 Welby Way, West Hills, California 91307 (the "SUBJECT PREMISES") as described more fully in Attachment A-1; and

    c.   an application for a warrant to search a white 1995 Ford Explorer bearing California license plate number 3LYB916 and registered to TILLMON (the "SUBJECT VEHICLE") as described more fully in Attachment A-2.

2.  The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 844(i) (Arson Affecting Interstate or Foreign Commerce) and 18 U.S.C. § 844(n) (Conspiracy to Commit Arson Affecting Interstate or Foreign Commerce) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been a SA for over 13 years.  I attended the University of California, Irvine, where I received a Bachelor of Arts Degree in Criminology, Law & Society.  I have received training in Federal arson laws and regulations at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy.  I have previously worked on Federal and State arson investigations, and have referred to these federal and state arson laws and regulations during the course of my duties.  I am currently assigned to the ATF Los Angeles Field Division, Arson & Explosives Group.

## III. SUMMARY OF PROBABLE CAUSE

5.    On May 31, 2020, a restaurant in Santa Monica, California, named Sake House by Hikari ("Sake House") was set on fire during the civil disturbance that took place in the city that day.  The Santa Monica Police Department ("SMPD") conducted subsequent investigation and identified TILLMON as the individual who started that fire, partially through identifying the SUBJECT VEHICLE.  Following SMPD's identification of

TILLMON, I worked to determine where TILLMON lives and identified the SUBJECT PREMISES as TILLMON's residence.

### IV. STATEMENT OF PROBABLE CAUSE

6.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Sake House Fire and Determination of Arson**

7.    On May 31, 2020, at approximately 5:02 p.m., the Santa Monica Fire Department ("SMFD") was dispatched to a structure fire at Sake House, which is located at 401 Santa Monica Boulevard.[1]  This occurred during a civil disturbance within the city, so once SMFD firefighters extinguished the fire, they quickly left the scene due to unsafe conditions. SMFD responded several times throughout the evening and night to extinguish flare-ups.  The interior of the restaurant sustained substantial fire damage, to include a hole burned through the ceiling.

8.    On June 4, 2020, SMFD investigators, SMPD officers and ATF agents (collectively, the "Investigative Team"), were granted access to Sake House to conduct a fire investigation. As part of that investigation, Sake House personnel provided the

---

[1] Sake House occupies the bottom floor of a two-story building that is located at the corner of 4th Street and Santa Monica Boulevard.  As such, Sake House's front doors open up to Santa Monica Boulevard and the interior of the restaurant extends away from Santa Monica Boulevard with large windows bordering the sidewalk that runs along 4th Street.

Investigative Team with security video recordings that depicted the inside of Sake House on May 31, 2020.[2]

9.   When I watched those video recordings, I saw that they showed three individuals roaming about inside Sake House in the minutes prior to the fire starting: 1) a female wearing a black top, distinctive green pants, and a black face mask; 2) a male wearing a dark blue sweatshirt and a light blue face mask; and 3) a male wearing a dark-colored jacket, blue jeans and a white bandana around his neck (the "Subject").  Then, those individuals all disappeared from the security camera's frame of view before the Subject walked back into frame and removed a red tube-shaped object from his jacket, which he placed behind the reception desk area of the restaurant before walking away.  Within seconds of that action, smoke and fire appeared from the area where the Subject placed the red tube-shaped object.

10.   SMFD personnel attached to the Investigative Team were responsible for conducting the origin and cause investigation into the source of the fire.  Those investigators formed the opinion that the fire was ignited from an outside source, specifically, the red tube-shaped object used by the Subject.

**B.   Identification of the Subject as TILLMON**

11.   In the days after June 4, 2020, SMPD Detectives reviewed videos posted to social media and security camera

---

[2] SMPD questioned Sake House personnel about the restaurant's clientele and those personnel indicated that they served customers from all over the country and all over the world.  Additionally, they indicated that most customers paid for their meals using credit or debit cards attached to banks from all over the country and all over the world.

recordings that captured scenes of the civil disturbance in the area around Sake House on May 31, 2020.  During that review, they found multiple videos of the Subject along with the other two individuals who were present inside Sake House in the minutes prior to fire starting.  I viewed those videos (and still frames captured from those videos) and noticed that some clearly depicted the Subject's face and other identifying features.  Most specifically, in several of those videos, a patch for Allied Universal Security Services ("Allied Universal") is noticeable on the left sleeve of the Subject's jacket.

12.  Another video I watched was captured on a security camera positioned on 4th Street, on the opposite side of Santa Monica Boulevard from Sake House (approximately 500 feet southeast of the restaurant).  That video shows the SUBJECT VEHICLE, i.e., a white Ford Explorer, parking immediately next to Sake House at the corner of Santa Monica Boulevard and 4th Street approximately four minutes before the fire started.  While the video does not clearly depict the Subject entering or exiting Sake House, the video shows the SUBJECT VEHICLE reversing across Santa Monica Boulevard towards the security camera in the moments after the fire started.  Then, the video shows the SUBJECT VEHICLE parking near the security camera's location and the Subject exiting the SUBJECT VEHICLE and looting a nearby business.

13.  That video does not clearly depict the SUBJECT VEHICLE's license plate number.  However, SMPD detectives found

a video posted to social media that was captured after the
SUBJECT VEHICLE reversed across Santa Monica Boulevard and
parked near the security camera.  In that video, the license
plate number is visible as "3LYB916."  I used a law enforcement
database to check the California Department of Motor Vehicles
registration associated with that license plate number and
learned that the SUBJECT VEHICLE is registered to TILLMON.

14.  Once I identified TILLMON as the registered owner of
the SUBJECT VEHICLE, I used a law enforcement database to locate
TILLMON's current California driver's license photograph.[3]  Then,
I compared that photograph to the above-noted videos that
clearly show the Subject's face.  Based on that review, I
believe TILLMON is the Subject.

**C.   Identification and Investigation of the SUBJECT
PREMISES**

15.  After I identified TILLMON as the Subject, I decided
to investigate whether TILLMON was employed by Allied Universal.
As noted above, the Subject was wearing a jacket with an Allied
Universal patch on the left sleeve on May 31, 2020.  On or about
June 15, 2020, I went to the Allied Universal office in Woodland
Hills, California, and spoke with a human resources manager.
That person told me that TILLMON had been employed by Allied
Universal but that his employment was terminated on or about May
26, 2020.

---

[3] TILLMON's driver's license shows his address as 9611 Shoup
Avenue in Chatsworth, California.  The SUBJECT VEHICLE is
registered to that address as well.

16.  Then, on June 18, 2020, the same human resources manager called me and said that earlier that day TILLMON had re-applied for a job at Allied Universal.  The human resources manager then told me that during the application process, TILLMON provided his current home address as the SUBJECT PREMISES.

17.  On June 19, 2020, I conducted surveillance at the SUBJECT PREMISES.  At approximately 11:59 a.m., I observed the SUBJECT VEHICLE parked inside the garage of the SUBJECT PREMISES.  Then, at approximately 12:32 p.m., I saw TILLMON exit through the front door of the SUBJECT PREMISES.

18.  On June 24, 2020, I conducted additional surveillance at the SUBJECT PREMISES.  At approximately 6:30 a.m., I saw the SUBJECT VEHICLE drive into and park in the garage of the SUBJECT PREMISES.  Then, TILLMON exited the front passenger door of the SUBJECT VEHICLE and entered the SUBJECT PREMISES.

**V.  <u>TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES</u>**

19.  Based on my training and experience and information obtained from other law enforcement officers who investigate arson, I know the following:

a.  People who engage in arson often derive great satisfaction from setting fires.  As such, they often plan their arsons well in advance and plan them meticulously.  To that end, an arsonist will often perform research about flammable materials, chemical accelerants, and/or explosives with an eye towards designing incendiary/destructive devices that will quickly and effectively cause a fire to grow.  That research can

be performed using various hard copy books or magazines. Oftentimes, that research is performed using the Internet on their digital devices.  It is common for an arsonist to record the results of his research in the form of plans, diagrams, and notes in a diary or journal and on his digital devices.  It is common for an arsonist to save those records for a long period of time and keep them in a place where they are readily accessible, such as his home or car.

       b.    Once an arsonist has completed his research and designed an incendiary/destructive device, it is common for the arsonist to accumulate stockpiles of flammable materials, chemical accelerants, and/or explosives and to maintain those stockpiles for long periods of time.  Sometimes, those supplies are available at local hardware stores, so any purchase would likely generate a physical receipt that would be stored in the arsonist's home or car.  Other times, arsonists purchase those supplies over the Internet using their digital devices and receipts of those transactions are usually stored in the memory of their digital devices.  Many people do not dispose of their records relating to these materials; they usually keep these records for long periods, in a secure location within their home or car.

       c.    After an arsonist purchases the component parts of an incendiary/destructive device, those supplies are typically stored in the arsonist's home (often in a garage or outbuilding), or in a rented storage facility.  In order to manufacture an incendiary/destructive device, an arsonist will

usually need a set of tools to construct the device and often has a designated work space in his home where the device is made.  Following the construction of an incendiary/destructive device, an arsonist will typically test its viability several times in order to perfect its performance.  He will often memorialize these tests by taking photographs or recording videos on his digital devices.  Many people do not dispose of those photographs or videos for long periods of time and keep hard copies of those photographs and videos in a secure location in their home or car.

20.  Based on my training and experience, I know that individuals who participate in arson often have co-conspirators who help them construct incendiary/destructive devices and/or choose targets to burn.  I know that much correspondence between these co-conspirators occurs by e-mail or text message sent to and from smart phones, laptops, or other digital devices.  This includes sending photos of incendiary/destructive devices and plans to make the same.  Therefore, based on my experience, I believe that it is probable that any digital devices found at the SUBJECT PREMISES may contain text-messages or e-mail between TILLMON and other individuals discussing explosives, incendiary devices, or destructive devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

21. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

  c. The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

 22. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TILLMON's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of TILLMON's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

13

## VII. <u>CONCLUSION</u>

25.   For all of the reasons described above, there is probable cause to believe that TILLMON has committed a violation of 18 U.S.C. § 844(i).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the SUBJECT VEHICLE as described in Attachment A-2.

/s/
Gabriel Denton, Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone this 25th day of June,
2020.

HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

14

## <u>ATTACHMENT A-1</u>

<u>PREMISES TO BE SEARCHED</u>

The premises located as 23818 Welby Way, West Hills, California 91307 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is a single-story, single family residence, with an attached garage located on the south side of Welby Way, between Peterson Avenue to the West and North Platt Avenue to the East.  The roof is shingle and grey in color.  The front door is blue in color and faces north to Welby Way.  The main structure is composed of stone and white stucco while the attached garage is white stucco.  A large hedge comprises part of the property barrier to the east and a large tree is planted on the front lawn.  The number "23818" is painted in black against a white background on the curb in front of the house.

## ATTACHMENT A-2

VEHICLE TO BE SEARCHED

A white 1995 Ford Explorer bearing California license plate number 3LYB916 and registered to Micah Tillmon (the "SUBJECT VEHICLE").

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 844(i) (Arson Affecting Interstate or Foreign Commerce) and 18 U.S.C. § 844(n) (Conspiracy to Commit Arson Affecting Interstate or Foreign Commerce) (the "Subject Offenses"), namely:

a.   Any clothes that appear to have been worn by Micah Tillmon on May 31, 2020;

b.   Any items that appear to have been stolen from Sake House by Hikari in Santa Monica, California, on May 31, 2020;

c.   Any and all explosives, incendiary devices, and destructive devices;

d.   Any and all parts and tools used in the manufacture of explosives, incendiary devices, and destructive devices, including PVC and or metal pipes, safety fuzes, black powder and other chemical accelerants;

e.   Any records, documents, programs, applications, or materials containing plans or diagrams related to the construction or assembly of incendiary devices or destructive devices;

f.   Any records, documents, programs, applications, or materials related to the sale, purchase, receipt, transportation, or possession of any explosives, incendiary devices, or destructive devices, including any receipts, bills

of sale, shipping receipts, credit card receipts, identification cards, bank statements, and correspondence requesting or confirming purchase, sale or shipment of such explosives, incendiary devices, or destructive devices;

g.    Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

h.    Any records, documents, programs, applications, or materials evidencing the identity of the person(s) controlling, occupying, possessing, residing in, or owning the SUBJECT PREMISES, including any rental agreements, leases, rent receipts, deeds, escrow documents, utility bills and other mailed envelopes reflecting the address and addressee;

i.    Contents of any calendar or date book stored on any of digital devices;

j.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

k.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

l.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers

accessed through any push-to-talk functions, as well as all received or missed incoming calls;

m.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

n.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

o.   Audio recordings, pictures, video recordings, or still captured images of explosives, incendiary devices, or destructive devices, and plans or diagrams outlining the construction of the same; and

p.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

q.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.   evidence of the times the device was used;

      vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending),

including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress TILLMON's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of TILLMON's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.